**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John TIMBANA, Defendant–Appellant.**

No. 97–30001.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 22, 2000

Filed July 28, 2000

Greg S. Silvey, Boise, Idaho, for the defendant-appellant.

Joanne P. Rodriguez, Assistant United States Attorney, Boise, Idaho, for the plaintiff-appellee.

Before: ALARCON, RYMER and KLEINFELD, Circuit Judges.

Opinion by Judge ALARCON; Partial Concurrence and Partial Dissent by Judge KLEINFELD.

ALARCON, Circuit Judge:

John Timbana appeals from the judgment entered following his plea of guilty to the crime of second-degree murder as part of a plea agreement. Timbana was indicted for first-degree murder committed on an Indian reservation in violation of 18 U.S.C. §§ 1111(a) and 1153. He was represented by Monte R. Whittier at the time of his guilty plea.

Mr. Whittier filed a notice of appeal and an opening brief on behalf of Timbana. Mr. Whittier set forth in the brief the issues Timbana wanted presented to this court pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Mr. Whittier asserts that Timbana requested that this court vacate the district court's sentencing decision on the ground that it abused its discretion in failing to grant Timbana a downward departure from his applicable range under the United States Sentencing Guidelines. Mr. Whittier informed this court that he believed that this issue was not appealable. Nevertheless, Mr. Whittier argued that the district court abused its discretion in denying a downward departure based on evidence in the presentence report that would support findings that Timbana's behavior was aberrant, that he suffered from physical and mental impairments, and that his conduct was provoked by the victim.

Mr. Whittier further argued that, because Timbana had suffered a traumatic brain injury, is confined to a wheelchair due to paralysis on his left side, is severely impaired on his right side, and has an I.Q. of approximately 72, Timbana would be vulnerable to victimization if incarcerated. Mr. Whittier also cited cases to support the proposition that a deficient mental capacity coupled with a physical impairment would be proper grounds for a downward departure. Finally, Mr. Whittier asserted

that, pursuant to U.S.S.G. § 5K2.10, Timbana was entitled to a downward departure because he was in fear of being struck on the metal plate in his head when he killed the victim.

On May 8, 1997, Mr. Whittier's motion to be relieved as counsel of record was referred to the panel assigned to consider the merits of the appeal. On the same date, Timbana's request for permission to file a supplemental brief was granted.

On November 4, 1997, this court's appellate commissioner granted Mr. Whittier's motion to be relieved as counsel of record. Timbana filed a pro se supplemental brief on August 5, 1998. On January 14, 1999, this matter was ordered submitted without argument pursuant to Rule 34(a)(2) of the Federal Rules of Appellate Procedure.

A majority and dissenting opinion were filed in this matter on May 7, 1999. On June 8, 1999, we filed an order withdrawing the May 7, 1999, opinion. On July 28, 1999, an order was filed appointing Greg S. Silvey as appellate counsel for Timbana. Mr. Silvey filed a brief on behalf of Timbana on November 3, 1999, in which he adopted the issues and arguments presented in Mr. Whittier's *Anders* brief and in Timbana's supplemental pro se brief. Accordingly, we will discuss the discrete contentions raised by and on behalf of Timbana separately. We begin our analysis with a summary of the facts in the record on the date Timbana entered his guilty plea.

## I

Timbana was indicted on February 14, 1996, and charged with first-degree murder committed on an Indian reservation in violation of 18 U.S.C. §§ 1111(a) and 1153. He was arraigned on February 16, 1996. On that date, his attorney requested a competency hearing. A competency hearing was conducted on July 18, 1996. In making its determination that Timbana was competent to stand trial, the court relied on reports submitted by Linda Berberoglu, Ph.D, a staff psychologist at the Federal Medical Center in Rochester, Minnesota, and Mark D. Corgiat, Ph.D., P.A., a clinical psychologist.

Dr. Berberoglu concluded as follows:

John Timbana is a 38–year–old, Native American male, who has significant brain damage, secondary to a head injury sustained in a car accident many years ago. Although he appears to have a moderate degree of cognitive impairment, his deficits are not severely disabling. His speech was somewhat simple and concrete at times, but his thought processes were very logical and rational, and he demonstrated adequate communication skills and reasoning ability when communicating with this examiner. He consistently demonstrated an awareness of the charges against him and repeatedly said, "They have to have evidence. They can't just go by hearsay or rumors." He was able to describe the roles of various judicial personnel. For example, he said the job of the judge is "to just sit there and listen to both sides." He indicated the judge is in charge of the courtroom. When asked whose side the judge is on, he replied, "No one's really. He's right in the middle." He stated the defense attorney "defends the defendant ... trying to shorten his moments of imprisonment ... whatever the defendant is telling to the defense attorney, they have to keep it confidential. No one else can hear, just only them two." He repeatedly referred to the opposing attorney as the "offense," and said his job is "to prosecute me." He explained the prosecutor is "saying I'm the one that done the crime. The defendant's got rights to say he didn't do it, but the offense is trying to say he really done it." He said the jury's job is to "make the decision if I really done the crime," which he said means determining whether "that person is capable of committing the crime that got him in this situation." He said after both sides have been presented, the jury "goes in

a solitary room and sits down," and decides "guilty or not guilty." He said the job of a witness is "testifying," which he defined as "they have to swear an oath to tell the truth ... he or she has to testify about what happened and they cannot go by hearsay." He did not know the meaning of perjury and was told this term meant lying under oath. He paraphrased this as "when they swear to tell the truth and nothing but the truth, and they don't. They're perjuring, telling a false story." During subsequent interviews, Mr. Timbana was able to define the term. He defined probation as when "you have to be home at 10 o'clock, no alcohol, no monkeying around. You have to check in with your probation officer, and if you don't, that's a violation. They can give you more time to sit it out in jail." He listed his plea options as "guilty and not guilty." When asked for a third possibility, he replied, "insanity plea," which he said means, "that he's loco, that they did what they're charged with, but there's excuses." He understands the possible consequences of various pleas and said the advantage of a plea bargain was the defendant might receive "a lighter sentence. That's mainly up to the judge." He could provide reasonable ideas for defense and prosecution witnesses. He also demonstrated the ability to disclose details about the events surrounding the offense and those involved, which could be relevant to a possible defense strategy. Overall, his ideas for defense strategies were logical and appropriately self-serving. He recalled important statements he made to the police at the time of his arrest and logically refuted them. Mr. Timbana understands what constitutes appropriate verses inappropriate courtroom behavior and understands his attorney will speak for him in Court. He believes it is important to have an attorney and plans to rely upon his attorney for advice. Therefore, in my professional opinion, although John

Timbana currently suffers from a mental disease or defect, it does not currently render him unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense.

Dr. Corgiat also concluded that Timbana was competent to stand trial. He expressed his conclusion in the following words:

It is my opinion that the defendant is capable of fully understanding the nature and object of the proceedings against him. I also find him capable of cooperating in a rational manner with counsel in presenting his defense. He appears to possess substantial capacity to appreciate the criminality of his conduct. He is also able to conform his conduct to the requirements of the law. He does appreciate and fully understands the charges against him. He demonstrates an adequate understanding of the legal adversarial system. He is able to explain the prosecutor's role as well as that of his attorney. He is also able to provide well-defined descriptions of the role of defense counsel, prosecuting attorney, judge, jury, defendant, and witnesses.

However, although Mr. Timbana is able to understand the relevant information to meet criteria for competency, the neurocognitive deficits which have been described above will clearly interfere with the quality of his ability to participate in his defense. There are two difficulties that bear directly on the issue of competency. First, the neurocognitive deficits as described above will reduce Mr. Timbana's problem-solving effectiveness, mental efficiency, and ability to adapt to these novel circumstances. As such, these deficits will render his opinions frequently concrete and at times frankly erred. His related lack of insight disallows him the opportunity to monitor these errors and appropriately adjust to them. As I noted above, the communi-

cation deficits will also hamper his self-description.

Secondly, frontal lobe deficits frequently result in markedly impaired emotional responsivity. With Mr. Timbana, this tends toward a hypo-reactivity which gives the impression that he lacks interest or concern. Frequently, frontal lobe deficits result in a reduction in the individual's ability to have a depth of emotional reaction. Within the current context, this raises the question of his ability to generate the appropriate motivational factors to genuinely participate in his defense.

To the best of my ability to evaluate this rather difficult situation, I do find Mr. Timbana is competent with regard to his ability to stand trial. However, I would caution that these other overlying neuro-cognitive and neurobehavioral difficulties will clearly reduce the quality of his ability to participate. Extra effort needs to be taken to provide information in as clear, concise, and slow a manner as possible. Again, I would reemphasize that one needs to take caution with evaluating Mr. Timbana's emotional responses, since they frequently will either underestimate or misrepresent his actual interest. Again, this is a direct result of the brain impairment and does not reflect an evaluative process on his behalf.

I hope this information is useful. Mr. Timbana is a very difficult individual to hold to the standard criteria of competency. Clearly, the complexity and multi-factorial nature of his deficits make this a very difficult decision.

Mr. Whittier did not request permission to cross-examine Dr. Berberoglu or Dr. Corgiat. Mr. Whittier offered to stipulate that Dr. Corgiat would testify that extra time would be required if the matter went to trial to explain to Timbana "what's going on and to be able to adequately address his questions" because "one of the problems Mr. Timbana suffers from is rigidity in thinking. If he gets a thought, he's going to stay with that thought until he's done with it." The prosecutor informed the court that she was willing to rely on Mr. Whittier's representation regarding Dr. Corgiat's proposed testimony without calling him as a witness. Mr. Whittier requested that the court appoint a second attorney to assist him at trial in responding to Timbana's questions and explaining the proceedings to him.

The court granted the request and authorized a second attorney to be present during trial. The court also stated that it would "shorten the period of time that we are actually in court and expand the recess times if that would be necessary and of assistance to counsel in assuring that counsel can communicate with the defendant." The court set the matter for trial on September 3, 1996.

On August 30, 1996, Mr. Whittier and the prosecutor agreed that, in exchange for Timbana's plea of guilty to the lesser included offense of second-degree murder, the Government would recommend that he receive a three-point reduction in his offense level for acceptance of responsibility and would move to dismiss the charge of first-degree murder.

The plea agreement sets forth the elements of second-degree murder as follows:

"a) the defendant killed Verdick Eldridge; b) the defendant killed Verdick Eldridge with malice aforethought; c) To kill with malice aforethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life."

The plea agreement also states that Timbana understands that he has the right to a trial by jury and to persist in his plea of not guilty, and that by pleading guilty he waives his right to a trial by jury. Finally, the plea agreement states that no person threatened or coerced Timbana to enter a plea of guilty, that the agreement has been read to him, that he has discussed the agreement with his attorney, and that he understands the agreement.

Timbana indicated his acquiescence in the plea agreement by marking it with an x.

The change of plea proceedings were conducted on September 3, 1996. The court first addressed Timbana as follows:

Mr. Timbana, before I can accept your guilty plea on a charge of second-degree murder, there are a number of questions I will ask you to assure that it is a valid plea. If you don't understand me at any time or if you wish to visit with Mr. Whittier before answering any of the Court's questions, would you please let me know and I'll let you have the time to visit with your attorney or I'll try to explain this in more detail. But you must let me know that you need to have an opportunity to confer with Counsel or to have me explain my questions more thoroughly. Can you do that?

Timbana responded: "Yes." Timbana was then sworn as a witness. The record next discloses the following colloquy:

QUESTIONS BY THE COURT:

Q Mr. Timbana, do you understand that having been sworn as a witness, that your answers to my questions will be subject to the penalties of perjury or making a false statement if you do not answer truthfully?

A Yes.

Q Okay. In other words, you could go to jail if you do not answer my questions truthfully; do you understand that?

A Yes.

Q Mr. Timbana, how old are you?

A Thirty-eight.

Q How far did you go in school?

A Ten

Q Tenth grade?

A Yeah. But I got my GED.

Q Okay. Have you taken any drugs, medicine or pills or consumed any alcoholic beverages in the last 24 hours?

A No.

Q Are you taking any prescribed medication at this time?

A No. Just antacid.

Q Okay. Is that for your stomach?

A Yeah, for the stomach lining.

Q Do you understand what is happening today?

A Briefly.

Q Would you tell me in your own words what you understand the proceedings to be about today.

A I understand I'm sitting here waiting for your judgment, your decision.

Q Okay. Now, what are you going to do today?

A Sit here and listen to you make the decision.

Q Okay. Do you understand that you are going to make a change in the plea that you have entered in this place?

A Yes.

Q Okay. And what is your plea going to be and to what charge?

A I'm going to decide to take second-degree murder, change it.

Q Okay. And so you're going to plead guilty to that count?

A Yes.

THE COURT: All right. Counsel, do either of you have any doubt at this point as to the Defendant's competency? I will note that the Court has already made that determination at an earlier time, but is there anything about his condition today that might call into question his competency to plead guilty?

MS. RODRIGUEZ: No, Your Honor.

THE COURT: Mr. Whittier?

MR. WHITTIER: No more than has been previously expressed to the Court, Your Honor.

THE COURT: There's been no change in circumstances?

MR. WHITTIER: No, Your Honor.

THE COURT: All right. Counsel, based on this record and Mr. Timbana's responses are all the appropriate and correct, the Court finds that the Defendant is competent to enter a plea at this time.

BY THE COURT:

Q Mr. Timbana, have you had enough time to discuss your case with your attorney?

A Yes.

Q Are you satisfied with Mr. Whittier's representation of you?

A Yes.

The court then proceeded to explain limitation of the sentencing guidelines on the court's power to fashion an appropriate sentence.

BY THE COURT:

Q Do you understand that under the Sentencing Guidelines, the Court is required to take into account all conduct, circumstances and injuries associated with your criminal conduct, whether or not this conduct is charged by the Government in the crime to which you're pleading guilty; do you understand that or do you want me to explain it?

A Explain it.

Q All right. What this means is that I will order a presentence report which will be prepared and which will include a discussion of all of your conduct, the circumstances and the injuries associated with this criminal act to which you're pleading guilty. That may include evidence which goes beyond the crime to which you're pleading, so that I can consider that if I find it to be reliable; do you understand that?

A Yes.

Q Okay. In other words, there's no limit placed on the information which the Court can consider at sentencing concerning your background, character and conduct again, so long as that information is reliable; do you understand that?

A Yes.

In a later passage, the court explained the court's discretion regarding the Government's sentencing recommendation. That portion of the record includes the following:

THE COURT: Mr. Timbana, do you understand that I would not be bound by any recommendation made by the Government in the plea agreement? They may recommend what sentence.

THE COURT: I believe they may have recommended acceptance of responsibility; is that correct?

MS. RODRIGUEZ: Yes, Your Honor.

BY THE COURT:

Q Do you understand that, Mr. Timbana?

A Yeah.

Q And I'm not bound by that; do you understand that?

A What do you mean?

Q Well, what I mean is that I don't have to give you that acceptance of responsibility, the two-point reduction or three. Is it three? I guess it would be three in this case.

MS. RODRIGUEZ: It would be three.

BY THE COURT:

Q Do you understand that?

MR. WHITTIER: If I might, Your Honor, the way I have explained that to Mr. Timbana is giving him the years under the guidelines that would be reflective of the three-point reduction for acceptance of responsibility and then I have gone on to further explain to him that those are the recommendations to the Court, the Court can give him less than those bracketed years or more. I don't think he

understands the concept of, you know, the guidelines. In speaking to him as to the year structure of the guidelines is how I have explained it to him.

BY THE COURT:

Q Mr. Timbana, is that correct?

A Yes.

Q Okay. So when I talked about these following the recommendation of the Prosecutor or of the U.S. Attorney, it would, in fact, affect the number of years that would be within this bracket; do you understand that?

A Yes.

Q And that decision would be mine and I would not be bound by the U.S. Attorney's recommendation; do you understand that?

A Yes.

During the recitation by the court of Timbana's constitutional rights, the following dialogue is reflected in the record:

BY THE COURT:

Q I'm going to explain to you your constitutional rights. These are very important, because you will be waiving or giving up these rights by pleading guilty, or at least most of them. So, if you do not understand, please have me stop and explain it to you again until you do understand it; all right?

A Yes.

Q First, do you understand that under the Constitution and laws of the United States that you are entitled to a trial by a jury on the charge contained in the indictment related to this case; do you understand that?

A Yes.

Q Do you understand that at the trial you would be presumed to be innocent and the Government would be required to prove you guilty by competent evidence and beyond a rea-sonable doubt before you could be found guilty?

A Yes.

Q Do you understand that you would never have the burden to prove yourself innocent, the burden is always with the Government to proof you guilty beyond a reasonable doubt; do you understand that?

A (No audible response.)

Q All right. Let me try to explain it a little better. Do you understand that a defendant in a criminal case does not have to prove that he or she is innocent; the burden is always on the Government to prove you guilty beyond a reasonable doubt; do you understand that? Do you want me to explain it to you or–

A Yeah.

MR. WHITTIER: Your Honor, I think the language he's having trouble with is the "reasonable doubt" language.

THE COURT: Okay.

BY THE COURT:

Q We put a real high burden on the Government in a criminal case, Mr. Timbana, they don't just have to prove that it probably happened, they have to prove that you committed the crime with a great deal of certainty, beyond a reasonable doubt, so that a jury has to be very convinced that you would commit the crime. That's the burden that the Government would have in a criminal case; do you understand that?

A Not really.

Q Okay. Well, it's for your protection and it's true in every criminal case in the United States, that the Government, the Prosecutor or the U.S. Attorney, has to prove you guilty to a high degree of evidence, with real certainty, that we are absolutely sure or quite sure—very sure, I

should say, that you committed the crime before you could be convicted; do you understand that?

A  Well, roughly, yeah.

Q  Okay. I don't know how to explain it any different than the way I have. Is there a specific question you have about that right?

A  No.

Q  Okay.

MR. WHITTIER: Your Honor, if I might. Again, how I explained it to Mr. Timbana was that the U.S. Government, in proving their case, would have to convince all 12 of the jurors, every one of them, unanimously the fact that he committed the crime. That is how it was explained to him by me.

THE COURT: That's another very good point.

BY THE COURT:

Q  Do you understand that, Mr. Timbana? That all 12 jurors would have to agree that the Government has proved you guilty?

A  Not really. They have to have perfect evidence though for me doing that.

Q  Okay. Now, you're understanding the notion. I don't know if "perfect evidence" is the right word. But you understand that they have to have very strong evidence before you could be convicted; is that your understanding?

A  (Witness nodding head.)

MR. WHITTIER: You have to answer out loud.

THE WITNESS: Yeah.

In discussing the effect of a plea of guilty on the privilege against self incrimination, the court questioned Timbana as follows:

Q  Now, another right that you have is the right not in incriminate yourself; do you understand that? You have the right not to make statements that would incriminate yourself; do you understand that?

MR. WHITTIER: I don't think he understands "incriminate."

THE COURT: All right.

BY THE COURT:

Q  You have the right not to make any statement that might help the Government prove the charges against you; do you understand that?

A  Not really.

Q  Mr. Timbana, our Constitution requires that the Government cannot prove you guilty by forcing you to testify, they have to go out and find other evidence; do you understand that?

A  Yeah.

Q  However, I'm going to have to ask you to waive that right to some extent, because I'm going to have to ask you questions to confirm that you feel that you are guilty; do you understand that?

A  Guilty of what though?

Q  Of second-degree murder.

A  Yeah.

Q  And so you understand that you're having to give up this right not to make statements that might help the Government because I'm going to have to ask you some questions, but I won't let them use those statements against you; do you understand that?

THE COURT: Mr. Whittier, if you want to consult with your client, perhaps you could explain it.

MR. WHITTIER: Your Honor, words that I have used in explaining this to Mr. Timbana prior to this is rather than the word "incriminate," I have always used the "right of silence." And I think he understands that concept better than the right against self-incrimination.

THE COURT: All right.

BY THE COURT:

Q  Mr. Timbana, do you understand that I would have to ask you to waive—that you will, in fact, waive or give up your right to silence, because I will have to ask you questions about the crime before I can accept your plea; do you understand that?

A  Yes.

Q  All right. Having heard this discussion of your rights, do you still wish to plead guilty and waive these rights that I have explained to you?

A  Yes.

The court proceeded to summarize the charge in the indictment in these words:

BY THE COURT:

Q  The indictment, as I will modify it to make it relevant, this charge reads as follows: That on or about February 11, 1996 at Fort Hall in the District of Idaho and within the exterior boundaries of the Fort Hall Indian Reservation, John Timbana, an Indian, killed Verdick Eldridge, a human being, with malice aforethought in violation of Title 18 United States Code Sections 1111(a) and 1153.

The court then resumed its questioning of Timbana to determine his comprehension of the charge:

Q  Is that the charge you understand that you will be pleading guilty to today?

A  Yes.

Q  Do you understand that to kill with malice aforethought means to kill deliberately and intentionally or to kill recklessly with disregard for human life; do you understand that?

A  Yes.

Q  Have you discussed with your attorney the charge in the indictment to which you intend to plead guilty? Have you discussed this with Mr. Whittier?

A  Yes.

After Timbana informed the court that he understood that the possible maximum punishment for the crime of second-degree murder was life imprisonment, the court directed the prosecutor to explain the elements of the crime of second-degree murder and the evidence that supported that charge. The prosecutor responded as follows:

Your Honor, the elements of second-degree murder are that the Defendant killed a human being with malice aforethought; meaning either deliberately and intentionally or recklessly with extreme disregard for human life and that those actions occurred on the reservation, with the Defendant being an Indian. Our evidence would show that John Timbana lived on the Fort Hall Indian Reservation in February of this year. On February the 11th of 1996, he, Verdick Eldridge and Alvina Phelps spent the afternoon at his home drinking beer. Timbana and Phelps, excuse me. It was Alvina Phelps. Timbana and Phelps had been common-law married, but she was then, as she described it, with Eldridge and had a baby with him.

Eventually that afternoon Eldridge passed out on the floor lying on his stomach. Alvina Phelps went into the bathroom and when she returned, she saw the Defendant on top of Eldridge, stabbing him in the back. Eldridge rolled over, kicking the Defendant and the Defendant then stabbed Eldridge seven more times in the chest, killing him. Phelps wrestled the knife away from Mr. Timbana, threw it into the other room and called for help. The Defendant was then arrested.

The next morning the Defendant waived his Miranda rights and gave a statement to the Fort Hall Police. He told them that he stabbed Eldridge in the back while Eldridge was asleep on the floor and then stabbed him in the chest with the kitchen knife because he was angry at Eldridge for, quote, "intruding in his

marriage life." Defendant John Timbana is an Indian.

Following this recital, the court resumed questioning Timbana:

BY THE COURT:

Q Mr. Timbana, do you agree with what Ms. Rodriguez has said about what you did?

A Yes.

Q Are you satisfied that if the jury accepted as true the evidence as stated by the Government attorney, that that would be a proper factual and legal basis for a finding of guilty on these charges?

A Yes.

Q All right. With that, I'm going to now ask you then to enter a plea to the charge of second-degree murder, which is the lesser included offense of the indictment as I have read it to you.

Thereafter, Timbana entered his plea of guilty to second-degree murder. After the plea was entered the court asked Timbana if he understood the terms of the plea agreement. Timbana replied: "Yes." The court then inquired of Mr. Whittier whether he was "satisfied that Mr. Timbana's plea of guilty to second-degree murder is a knowledgeable and voluntary plea." Mr. Whittier responded: "Yes, Your Honor."

The court next inquired whether Mr. Whittier knew of any reason why the plea should not be accepted. Mr. Whittier replied: "No, Your Honor."

In accepting the plea, the court stated: Mr. Timbana, since you are satisfied in all respects with the services of Counsel and since you acknowledge that you are, in fact, guilty as charged of the lesser included offense of second-degree murder, you know your right to a trial, you know what the maximum possible punishment is, you are aware that the Court is not bound by the plea agreement and you have told me that you are voluntarily pleading guilty, I'm going to find that your plea of guilty to second-degree murder is knowing and voluntary and I will accept it and enter a judgment of guilty as to that crime.

The probation officer who prepared the October 17, 1996, presentence report recommended that Timbana receive a three-point offense level reduction because "Defendant has entered a guilty plea to the lesser included offense of second-degree murder and has acknowledged to both the probation officer and arresting authorities that he did stab Verdick Eldridge to death on February 11, 1995." Timbana had explained to the probation officer "his fear that his common-law wife, Alvina Phelps, or her boyfriend, the victim, Verdick Eldridge, were going to hurt him by striking the steel plate on his head." The probation officer reported that, "in view of defendant's physical limitations and his claim he was protecting himself from the assaultive nature of his victim, the court might desire to sentence defendant below the guideline range in accordance with § 5K2.10."

Mr. Whittier filed a motion for a downward departure based on evidence in the presentence report that demonstrated that Timbana's conduct was but a single act of aberrant behavior. Mr. Whittier also requested that the court consider Timbana's physical and mental impairments, and the fact that Eldridge's conduct may have provoked Timbana to commit the homicide. Mr. Whittier did not, however, object to the probation officer's calculation of the guideline range of 97 to 121 months.

In rejecting Timbana's request for a downward departure at the sentencing hearing, the court made the following statement:

[L]et me deal with each of the specific matters raised by Mr. Whittier in his request. First, with regard to aberrant behavior. Let me first indicate that the Court recognizes that aberrant behavior can be a valid grounds for a downward departure as set forth in the sentencing guidelines. It, in essence, is, I think,

one might say, applies when one is not only subject to a first offense, but it perhaps characterizes a pure heart overcome by momentary weakness.

The Court has discretion in deciding whether to grant a downward departure for this and each of the grounds mentioned by Mr. Whittier. I want that clear for the record. The Court perceives this, not that I am precluded as a matter of law from granting a downward departure, but rather each of these are a matter for the Court's discretion.

The question in each instance is: Does the factor mentioned and the circumstances of this case justify the imposition of a sentence below the guideline range.

The court adopted the guideline range of 97 to 121 months as calculated and recommended by the probation officer. The Government recommended that the court impose the maximum sentence. Mr. Whittier recommended that the court impose the minimum sentence. The court sentenced Timbana to a term of imprisonment of 97 months.

The Government moved to dismiss the charge of first-degree murder. The court granted the motion.

Timbana did not file a motion to set aside his guilty plea before judgment was entered, nor has he filed a motion attacking his sentence pursuant to 28 U.S.C. § 2255. Instead, he filed a timely notice of appeal from the final judgment and sentence on December 3, 1996.

## II

In the brief filed by Mr. Whittier, Timbana contends that the trial court abused its discretion in denying his request for a downward departure from the sentencing guideline range of 97 to 121 months.

■ We have no jurisdiction to review a district court's discretionary refusal to grant a downward departure. *See United States v. Tucker*, 133 F.3d 1208, 1219 (9th Cir.1998). We may review a district court's conclusion that it lacked the discretion. *Id.* Here, the district court did not indicate that it lacked the authority to depart from the Sentencing Guidelines. Instead, the district court stated that "the court has discretion in deciding whether to grant a downward departure for [aberrant behavior] and each of the grounds mentioned by Mr. Whittier." Accordingly, we lack jurisdiction to review the denial of Timbana's motion for a downward departure.

## III

After Mr. Whittier was relieved of his representation of Timbana, Timbana filed pro se a supplemental brief in which he alleges that (1) he was deprived of his right to the effective assistance of counsel; (2) he was denied his right of allocution prior to the imposition of sentence in violation of Federal Rule of Criminal Procedure 32(c)(3)(C); (3) his incarceration is unconstitutional because he is innocent; (4) he was not competent to understand the nature of the proceedings before the court; and (5) his guilty plea was not voluntary.

Timbana asserts that Mr. Whittier's representation was ineffective on several grounds. Timbana argues that Mr. Whittier failed to conduct a proper investigation or move to suppress his confession, permitted him to enter a guilty plea when he had reason to believe that his client was innocent, and coerced him into pleading guilty. There is no evidence in the present record in this direct appeal to support his claim that his attorney failed to conduct a proper investigation of any possible defense, or that counsel had reason to believe his client was innocent.

Timbana confessed to the police that he stabbed the victim. During the plea proceedings, he testified under oath that he agreed with the prosecutor's statement that Timbana stabbed the victim in the back and in his chest, and that there was a proper factual and legal basis for a finding of guilty of second-degree murder. The

Supreme Court has instructed that "a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case." *Menna v. New York,* 423 U.S. 61, 62 n. 2, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975).

■ On a direct appeal, we are confined to ruling on error that is demonstrated in the record of the proceedings before the trial court. There is no support in the record for Timbana's assertion that he was physically incapable of stabbing his victim. In fact, Dr. Corgiat reported that, while Timbana suffers from a deficit in motor skills, the deficit is more severe on his left side than on his right side and he is still capable of moving about without his wheelchair and of grasping objects and performing tasks with his right hand. Dr. Corgiat also reported that his grip strength on his right side is only mildly impaired even though his ability to perform fine motor movements is moderately impaired. Dr. Berberoglu also noted that Timbana is capable of moving about with a cane, although he prefers to use a wheelchair. Whether evidence that Timbana was incapable of committing the crime existed outside of the record cannot be determined on this appeal. We have previously held that "[t]he customary procedure for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255. This is so because usually such a claim cannot be advanced without the development of facts outside the original record." *United States v. Birges,* 723 F.2d 666, 670 (9th Cir.1984) (internal citations omitted). Timbana has failed to demonstrate that he was deprived of the effective assistance of counsel. Our rejection of this contention is without prejudice to the assertion by Timbana of a Sixth Amendment violation in a petition filed pursuant to 28 U.S.C. § 2255 based on evidence that may exist outside the record now before us.

## IV

■ Timbana also argues that the Due Process Clause "preclude[s] his incarceration where he has met his burden of showing actual innocence." As discussed above, Timbana did not contend, or make a showing during the competency plea and sentencing proceedings, that he was actually innocent because he was physically incapable of committing the crime of second-degree murder. To the contrary, he admitted under oath that he stabbed the victim to death because he was angry at him for intruding into his marriage life. Thus, he has failed to demonstrate in this appeal that he was deprived of his right to due process. We express no view regarding whether Timbana can demonstrate through competent evidence in a collateral attack on his conviction that he was deprived of his right to due process because he was physically incapable of stabbing his victim to death.

## V

Timbana's contention that he was denied his right to allocution is without merit. The record shows that prior to pronouncing sentence, the court stated:

> Mr. Timbana, do you wish to speak in your own behalf regarding the sentence in these matters? And I realize you have some restrictions on your speech and will take whatever time you feel is necessary so that you can adequately express your feelings to the court.

Timbana declined to make a statement.

## VI

■ In his pro se supplemental brief, Timbana contends that the court did not make an independent finding that Timbana was competent to proceed to trial. He argues that "[a]ll the record contains is a concession from defense counsel this his client is competent to proceed to trial." We review for clear error a district court's determination that a defendant is competent to stand trial. *See United States v.*

*Chischilly*, 30 F.3d 1144, 1150 (9th Cir. 1994).

■ In determining Timbana's competency to stand trial, the court reviewed the reports prepared by Dr. Berberoglu and Dr. Corgiat. The court noted that both experts concluded that Timbana was competent to stand trial, although they expressed concern "about his ability to communicate and understand the trial proceedings, unless we can perhaps make some special accommodations for his physical shortcomings, which have resulted in brain damage." Timbana's counsel waived the right to present additional evidence or to cross-examine Dr. Berberoglu and Dr. Corgiat. Contrary to Timbana's assertion, the court expressly found that Timbana was competent. The court ruled as follows: "I will find that the defendant is competent to stand trial as set forth in 18 U.S.C., Section 41."

At the commencement of the change of plea proceedings, the court asked Timbana to state in his own words whether he understood the nature of the proceedings. Timbana replied: "I understand that I'm sitting here waiting for your judgment, your decision." He then stated: "I'm going to decide to take a second-degree murder, change it." Each of Timbana's replies to the court's questions throughout the plea proceedings were appropriately responsive. When he did not understand a question, he asked for an explanation.

The court inquired of counsel whether there was anything about Timbana's present condition "that might call into question his competency to plead guilty." Mr. Whittier replied that there had been no change in circumstances since the competency hearing. The court expressly found that Timbana was competent to enter a guilty plea. The reports of both experts support the court's finding that, notwithstanding his physical and mental impairments, Timbana was competent to stand trial. The district court did not clearly err in finding Timbana was competent to stand trial and to enter a guilty plea.

## VII

■ In his pro se brief, Timbana argues that his plea was not knowing and voluntary. We review the voluntariness of a guilty plea de novo. *See United States v. Kikuyama*, 109 F.3d 536, 537 (9th Cir. 1997).

■ Timbana first asserts that he was coerced to enter a guilty plea even though he had informed Mr. Whittier that he did not commit the crime. The record of the plea proceedings does not contain any evidence that Timbana was coerced to enter a guilty plea or that he informed his attorney that he did not commit murder. In fact, Timbana testified under oath that he was not threatened by anyone, or forced to plead guilty.

Timbana argues that "the record is devoid of any reference to the requirement that his counsel read the complete agreement to him and to make sure he understands the agreement." This argument is readily refuted by the terms of the plea agreement. The plea agreement provides that "[t]he defendant states he has had said agreement read to him; has discussed said agreement with his attorney and understands this agreement." Furthermore, during the plea proceedings, Timbana testified under oath that he understood the terms of the plea agreement.

The record of the plea proceedings shows that the court carefully informed Timbana of the constitutional rights he would be giving up if he entered a guilty plea. When the court discussed the concept of proof beyond a reasonable doubt with Timbana, he indicated that he understood the explanation "roughly." Timbana told the court that he understood reasonable doubt to mean that, for the jury to convict him, "[t]hey have to have perfect evidence though for me doing that."[1]

---

1. We note that a clear definition of the reasonable doubt standard has evaded even

When the court asked Timbana if he understood that he had the right not to make any statement that might help the Government prove the charges against him, Timbana responded: "Not really." The court then advised him that "our Constitution requires that the Government cannot prove you guilty by forcing you to testify, they have to go out and find other evidence." Timbana informed the court that he understood the court's explanation. The record shows that, whenever Timbana raised a question concerning the effect of a guilty plea and the waiver of his constitutional rights, the district court explained the concept, or what was happening in terms Timbana could understand. After each clarification, Timbana indicated he understood.

Timbana also maintains that he was not advised that proof of an intent to kill the victim is an element of the crime of murder. This contention is frivolous. The record shows that the court and the prosecutor informed Timbana that to be guilty of second-degree murder, the Government was required to prove that the victim was killed deliberately and intentionally or with a reckless disregard for human life. Timbana replied that he understood. The prosecutor also recited the elements of second-degree murder, including the mens rea requirement, in summarizing the evidence the Government was prepared to present in the event of a trial. Timbana has failed to demonstrate that his guilty plea was not voluntary or knowing. We again stress that our conclusion that the plea was knowing and voluntary is based on the record of the plea proceedings. Timbana assured the court he understood his rights and was freely and voluntarily giving them up in order to enter a plea to the lesser offense of second-degree murder. Whether Timbana's testimony that he understood his rights and freely and voluntarily agreed to waive them by pleading guilty was false is not demonstrated in the record before us.

## VIII

■ Mr. Silvey makes two additional arguments that were not raised in the district court or in Mr. Whittier's brief, or in Timbana's supplemental pro se brief. He first argues that the district court did not comply with Rule 11(c) and (f) of the Federal Rules of Criminal Procedure. We review the adequacy of a Rule 11 plea hearing de novo. *See United States v. Aguilar–Muniz,* 156 F.3d 974, 976 (9th Cir.1998). The 30–page transcript of the plea proceedings shows that the court patiently and scrupulously fulfilled its duty under Rule 11(c) and (f).

Rule 11(c) provides that, before accepting a plea of guilty,

[T]he court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:

(1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from those guidelines under some circumstances, and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense; and

(2) if the defendant is not represented by an attorney, that the defendant has

learned federal judges. *See, e.g., United States v. Adkins,* 937 F.2d 947, 950 (4th Cir.1991) ("This circuit has repeatedly warned against giving the jury definitions of reasonable doubt, because definitions tend to impermissibly lessen the burden of proof.... The only exception to our categorical disdain for definition is when the jury specifically requests it."), (internal citations omitted); *United States v. Hall,* 854 F.2d 1036, 1039 (7th Cir. 1988) (upholding the district court's refusal to provide a definition, despite jury's request, because "at best, definitions of reasonable doubt are unhelpful to a jury....." An attempt to define reasonable doubt presents a risk without any real benefit.).

the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant; and

(3) that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against compelled self-incrimination; and

(4) that if a plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to a trial; and

(5) if the court intends to question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant has pleaded, that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement; and

(6) the terms of any provision in a plea agreement waiving the right to appeal or to collaterally attack the sentence.

The record shows that the court addressed Timbana personally and advised him of each of the matters set forth in Rule 11(c), including his right to be tried by a jury, the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against self-incrimination. As discussed above, during the court's recitation of his rights, Timbana asked for an explanation of certain legal concepts such as the reasonable doubt standard and the right against self-incrimination. After the court explained these terms, Timbana indicated that he understood each of the rights set forth in Rule 11(c).

Rule 11(f) provides as follows: "Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such a plea without making

such factual inquiry as shall satisfy it that there is a factual basis for the plea." Mr. Silvey contends that "Timbana's simple agreement with the prosecutor's recitation does not establish an adequate factual basis" for Timbana's guilty plea. Mr. Silvey suggests that "[a] better procedure would require the court to not just have Mr. Timbana agree or disagree with the prosecutor's recitation, but to also have Mr. Timbana explain in his own words what he had done."

Mr. Silvey has not cited any authority to support the proposition that a district court is required to base its determination that a factual basis for a plea exists on the defendant's recitation of the relevant facts. Moreover, the court required the prosecutor to discuss the elements of second-degree murder and to recite what the evidence would show if presented to a trier of fact.

After the prosecutor summarized the facts, the court stated: "Mr. Timbana, do you agree with what Ms. Rodriguez has said about what you did." Timbana replied: "Yes." The court then asked whether the evidence stated by the prosecutor "would be a proper factual and legal basis for a finding of guilty on these charges." Timbana again responded: "Yes."

■ The prosecutor's recitation of the evidence the Government was prepared to present to a trier of fact clearly demonstrated that Timbana acted with malice aforethought in killing Eldridge to avenge his intrusion into Timbana's relationship with his common-law wife. Timbana's admission that he agreed with the prosecutor's description of Timbana's conduct clearly demonstrated that there was a factual basis for the guilty plea.

Mr. Silvey asserts that "it is unclear what [Timbana] was agreeing with" when he was asked whether he agreed "with what Ms. Rodriguez said about what you did." Mr. Silvey speculates that, because of Timbana's mental and physical impairments, he may have been merely agreeing

with only the last thing the prosecutor said, which was that Timbana was an Indian. This argument ignores the fact that Timbana was responding to a question concerning what he did, and, further, that Timbana immediately thereafter agreed that there was a proper factual and legal basis for a jury to find him guilty of second-degree murder.

■ Mr. Silvey contends that the court should have inquired further into the factual bases for the plea in light of its awareness of the contents of the Dr. Berberoglu's and Dr. Corgiat's reports. Dr. Berberoglu's report shows that Timbana's speech was "organized, logical, and rational." He also "demonstrated adequate concentration and attention during interviews." Timbana was also "able to paraphrase the meaning of unfamiliar concepts after they were explained to him." The report also provides that "his thought processes were very logical and rational, and he demonstrated adequate communication skills and reasoning ability."

Dr. Corgiat cautioned that, while Timbana was competent to stand trial, because of his impairments "[e]xtra effort needs to be taken to provide information in as clear, concise, and slow a manner as possible."

The record of the competency proceeding reflects that the court was mindful from reading the experts' reports "that there are some concerns about [Timbana's] ability to communicate and understand the trial proceedings." Mr. Whittier informed the court during the competency hearing that "a lot of extra time is going to need to be spent ... at trial to explain what's going on and to be able to adequately address his questions." In granting Mr. Whittier's request for the appointment of a second attorney to assist him in dealing with Timbana's "rigidity in thinking," the court recognized that its finding that Timbana was competent "does not detract from the fact that there's going to be some significant challenges in insuring that Mr. Timbana is in fact effectively represented in this proceeding and effectively participates in this proceeding." The court also requested that Mr. Whittier "work with Dr. Corgiat and get his recommendation as to ways we might structure the trial" to assist counsel in communicating with Timbana.

At the commencement of the plea proceedings, the court instructed Timbana that, if he did not understand a question, the court would try to explain it in more detail. The court cautioned Timbana that "you must let me know that you need an opportunity to confer with counsel or to have me explain my questions more thoroughly." The court's comments at the competency and plea proceedings demonstrate that the court understood that information should be provided to Timbana in a clear, concise, and slow manner.

To reverse the judgment of conviction on this record, we would have to presume that Timbana did not understand the court's questions when he testified under oath that he did. We would also have to speculate or presume that he did not understand the prosecutor's recitation of the evidence showing that he committed a second-degree murder, notwithstanding his statement that he agreed with what the prosecutor had stated. The psychological evaluations in the record, and his conduct in the district court, do not support the conclusion that Timbana's impairments would lead him to say he understood something when he did not, that he would hesitate to ask questions, or to express confusion, if he did not understand. The record shows that he asked several questions and requested an explanation of concepts he did not understand.

Mr. Silvey requests that we vacate the judgment and remand with instructions to permit Timbana to enter a plea of not guilty because the court failed to ask Timbana to state in his own words what he did. He cites several out-of-circuit cases to support his contention that "[t]he requirement that an otherwise adequate Rule 11 colloquy be broadened under cer-

tain circumstances is not unprecedented or unsuggested." Each case is readily distinguishable.

In *Monroe v. United States,* 463 F.2d 1032 (5th Cir.1972), the Fifth Circuit held that the district court erred in denying the motion to vacate a plea of guilty pursuant to 28 U.S.C. § 2255 for failure to comply with Rule 11 of the Federal Rules of Criminal Procedure. *Id.* at 1033. The instant matter is before this court on direct appeal. The record in this direct appeal demonstrates that the court complied with Rule 11(f) and that Timbana's guilty plea was knowing and voluntary based on his responses to the court's questions. We cannot conclude from the record before us that Timbana did not in fact understand the court's questions concerning his rights or regarding the factual basis for the plea.

In *United States v. Cole,* 813 F.2d 43 (3rd Cir.1987), the Third Circuit reversed the district court's denial of the appellant's motion to vacate his guilty plea for the failure of the district court to comply with Rule 11. *Id.* at 47–48. In *Cole,* the appellant had informed the court during the plea proceedings that he had used drugs the previous evening. The district court in *Cole* failed to inquire into the impact of the recent drug usage on the defendant's competency to enter a guilty plea. *Id.* at 44. Here, the record shows that the court conducted a competency hearing in advance of the change of plea hearing and again revisited the competency issue before allowing Timbana to enter a guilty plea.

In *United States v. Parra–Ibanez,* 936 F.2d 588 (1st Cir.1991), the defendant informed the district court at the outset of the plea proceedings that he had consumed three different drugs in the preceding 24 hours. *Id.* at 590. The First Circuit held that the district court erred in failing to conduct an inquiry as to the effects of the appellant's medication. *Id.* at 598. The court remanded for a hearing to determine whether the Rule 11 error was harmless. *Id.*

Our dissenting colleague agrees with our conclusion that the competency determination of the court "was adequately supported." Dissenting Op. at 710. The record shows that the district court carefully complied with its duty to determine whether Timbana was competent to enter a guilty plea. Nevertheless, the dissent asserts that "[t]he First, Second, Third, Fourth, Fifth, Eleventh and District of Columbia Circuits have spoken on analogous facts and held that where the particular circumstances made the defendant's plea suspect, an otherwise adequate Rule 11 colloquy had to be broadened, requiring reversal. Thus, the majority opinion puts [the Ninth Circuit] at odds with those seven circuits. No other circuit has taken the majority's view." Dissenting Op. at 715.

The principle announced by our sister circuits in the cases cited in the dissent is that, where a district court is made aware during a Rule 11 proceeding that a defendant's competency to enter a plea may be impaired, it must conduct an inquiry before accepting a guilty plea. A fair reading of the cases cited in the dissent will demonstrate that none is based on "analogous facts" and that our decision today does not put the Ninth Circuit "at odds" with seven other circuits.

In *United States v. Masthers,* 539 F.2d 721 (D.C.Cir.1976), the District of Columbia Circuit held that the district court erred in denying the appellant's motions to vacate his plea of guilty pursuant to 28 U.S.C. § 2255 and to withdraw the plea based on Rule 32(d) without conducting a hearing. *Id.* at 722. The court in *Masthers* held *inter alia* that the district court erred in denying the appellant's motions on the ground that he failed to raise the competency issue prior to sentencing. *Id.* at 727. The District of Columbia Circuit noted that, in accepting the guilty plea, the district court had ignored "early signs suggesting retardation." *Id.* In the instant matter, the district court was not asked to

set aside the plea under § 2255 or Rule 32(d). Moreover, the district court here squarely confronted the issue of Timbana's competency prior to accepting his plea. That is not what happened in *Masthers*.

As noted above, in *Monroe*, the district court denied the petitioner's § 2255 motion to vacate the sentence imposed after he entered a guilty plea. 463 F.2d at 1033. The Fifth Circuit reversed the judgment, holding that the guilty plea did not meet constitutional standards of voluntariness because the district court failed to comply with the requirement of Rule 11 that the court personally address a defendant to determine whether he understands the nature of the charge and the consequences of a guilty plea. *Id.* at 1036. The court concluded that the plea proceeding was inadequate to insure the voluntariness of the plea because the district court relied on the statements of the prosecutor and defense counsel in determining whether there was a factual basis for the plea, and failed to inquire into the defendant's understanding of the nature of the charges against him. *Id.* at 1035. The record reflected the following colloquy:

> MR. CARROUTH [Assistant United States Attorney]: David Monroe, you are charged in this Court with violation of Title 18 United States Code, Section 1111, with reference to the offense of Second [sic] Degree Murder. Do you understand the nature of the charge against you?
>
> DEFENDANT MONROE: Yes sir. I do.
>
> .    .    .    .    .
>
> THE COURT: Mr. Wadsworth [attorney for defendant], for the record, and whether it is the truth of the matter, have you had adequate oppor-

tunity to confer with your client about this matter here?

> MR. WADSWORTH: Yes, I have, Your Honor. I have been over this Waiver and Consent form with him, word for word, and I am sure that he understands it, Your Honor.
>
> THE COURT: You are satisfied in your own mind that he has thorough comprehension of what he is doing and what he is getting into.
>
> MR. WADSWORTH: He understands as well as he can.
>
> THE COURT: You mean by that that he understands the nature of his charge?
>
> MR. WADSWORTH: Yes sir.
>
> THE COURT: And he understands that he is now pleading guilty to it?
>
> MR. WADSWORTH: Yes sir.
>
> THE COURT: And the punishment that he could receive?
>
> MR. WADSWORTH: Yes sir.

*Id.* at 1033–34 n. 1.[2] No comparable error occurred in this case. The district court here directly and personally addressed Timbana and explicitly inquired as to whether he understood the nature of the charges and the consequences of a guilty plea. The question whether Timbana can demonstrate in a proceeding pursuant to § 2255 that he did not understand the court's questions that he answered in the affirmative concerning the nature of the charge against him and the facts necessary to prove it is not before us in this direct appeal.

The dissent's reliance on *Gaddy v. Linahan*, 780 F.2d 935 (11th Cir.1986), is also misplaced. The state prisoner in *Gaddy* filed a petition for a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254. *Id.* at 938. He argued that his

---

2. In reviewing this colloquy, the Fifth Circuit commented as follows:

> In summary, it appears that the thrust of inquiry at the proceeding was almost solely in the direction of whether the statements made by the prosecutor and the defense

counsel were sufficiently complete and consistent to meet the requirement of a factual basis for a plea and not upon what the defendant understood concerning the charge. *Id.*

plea of guilty was involuntary. *Id.* The record of the plea proceedings before the Georgia state court revealed that the petitioner answered "Yes, sir" when the prosecutor asked him whether he "had any drugs at all today?" *Id.* at 939. The prosecutor did not ask the petitioner what drugs he had taken that day, "[n]or did the court pursue the point when it questioned petitioner moments later." *Id.*

Before filing his § 2254 petition, the petitioner in *Gaddy* had filed a petition for habeas corpus relief in state court. *Id.* at 940. The state court granted an evidentiary hearing. *Id.* The petitioner testified he had ingested cocaine the morning that he entered his guilty plea because he was nervous and anxious about his pending trial. *Id.* The state court denied the petition. *Id.* at 941.

The petitioner in *Gaddy* presented the same claim in his federal habeas corpus petition. *Id.* at 941–42. The district court denied the § 2254 petition without conducting an evidentiary hearing to determine whether the petitioner was under the influence of cocaine at the time he entered his guilty plea, and what impact it may have had on his competency to enter a guilty plea. *Id.* at 942. The Eleventh Circuit vacated the judgment of the district court in *Gaddy* and remanded the matter for an evidentiary hearing "on the question of what, if any, information petitioner received and understood prior to pleading guilty, concerning the elements of malice murder." *Id.* at 946. In contrast to the situation in *Gaddy*, the district court in the matter *sub judice* did not ignore evidence that required an inquiry into Timbana's capacity to enter a knowing and voluntary guilty plea.

The district court's conduct of the plea proceeding in this matter also complied with the First Circuit's decision in *Parra–Ibanez*. In *Parra–Ibanez*, the First Circuit remanded for an evidentiary hearing because the district court failed to conduct an inquiry regarding the ability of the defendant to enter a knowing and intelligent plea after being informed that the defendant had ingested three drugs within twenty-four hours of the Rule 11 proceedings. 936 F.2d at 598. As in *Masthers* and *Gaddy*, the district court in *Parra–Ibanez*, in accepting the plea, ignored statements that called the defendant's competency into question. The district court here, in contrast, conducted extensive proceedings to determine Timbana's competency before accepting his guilty plea.

The dissent also relies on *United States v. Rossillo*, 853 F.2d 1062 (2d Cir.1988), *United States v. Cole*, 813 F.2d 43 (3d Cir.1987), and *United States v. Damon*, 191 F.3d 561 (4th Cir.1999), in arguing that we should vacate the plea and remand. As in *Parra–Ibanez*, the court of appeal in each of these cases concluded that the district court erred when it failed to conduct an inquiry into the defendant's competency to enter a guilty plea after it was put on notice during the Rule 11 hearing that he may have recently ingested medication or drugs. *See Damon*, 191 F.3d at 565; *Rossillo*, 853 F.2d at 1067; or *Cole*, 813 F.2d at 44–46.

As discussed above, the district court in this matter conducted the type of inquiry demanded by each of the cases cited by the dissent to determine whether Timbana was competent to enter a guilty plea. In each of the seven cases, the court of appeals concluded that the trial court erroneously ignored evidence that cast doubt on the defendant's competency. As required by the First, Second, Third, Fourth, Fifth, Eleventh, and D.C. Circuits, as well as this circuit, the district court in this matter did not ignore evidence casting doubt on Timbana's competency to enter a guilty plea. The district court conducted a searching inquiry into Timbana's competency to enter a guilty plea.

IX

The record shows that the court held a competency hearing regarding the effect of

Timbana's mental and physical impairments on his competency to enter a guilty plea. No evidence was offered at the competency hearing to rebut the expert's opinions that Timbana was competent to stand trial. The court again revisited Timbana's competency at the change of plea hearing and was told by Mr. Whittier that nothing had changed since the competency hearing. The district court did not err in finding that Timbana was competent to enter a guilty plea. Mr. Silvey has failed to demonstrate from the record now before us, that we should remand this matter for a reconsideration of Timbana's competency to enter a guilty plea.

## X

Mr. Silvey urges this court to remand for resentencing if we reject his contention that the guilty plea must be vacated. He notes that, while this appeal was pending, United States Sentencing Guideline § 5K2.13 was amended on November 1, 1998. As amended, § 5K2.13 provides that "[a] sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity."

The amendment to § 5K2.13 does not state that it is retroactive. It substantially altered the guideline rather than merely clarifying it. Therefore, the amendment is not retroactive. *See United States v. Innie*, 77 F.3d 1207, 1209 (9th Cir.1996). The amendment would apply only if we were to vacate Timbana's guilty plea. *See United States v. Canon*, 66 F.3d 1073, 1076 n. 1 (9th Cir.1995) (stating that a district court must apply the version of the Sentencing Guidelines in effect on the date of resentencing). We have concluded that the record before us provides no basis for vacating Timbana's guilty plea. Therefore, we decline to remand for resentencing.

## Conclusion

We conclude that the record before us shows that Timbana was competent to enter a guilty plea and that he did so knowingly and voluntarily following a plea proceeding that was consistent with Rule 11. Many of the arguments raised in the appellant's briefs are based on assumptions of a lack of competency or culpability that find no support in the present record. Questions regarding the effectiveness of counsel's representation, and whether Timbana understood the nature of the plea proceedings, or his right to a trial based on a claim of self defense, must await consideration another day, should Timbana file a motion to vacate his guilty plea pursuant to § 2255.

AFFIRMED.

KLEINFELD, Circuit Judge, concurring in part and dissenting in part:

I concur in all parts of the disposition except for Parts VII and VIII. As to those parts, I respectfully dissent.

The most fundamental distinction in criminal law is between those who committed the crime charged and those who did not. Most defendants plead guilty before trial to the crime charged or some lesser offense. That makes the change of plea proceeding the occasion when we do most of the sorting between the guilty and those who are innocent or not proved guilty. The point of the change of plea colloquy is not merely to close the case. We are not a machine for closing cases, like a bottle capper in a brewery. The point, like the point of most procedural safeguards, is to assure that only the guilty are convicted of crimes. The procedure has to be a reliable means of assuring accuracy, or else it is worse than useless. Where the proceeding was conducted in a manner that does not offer reasonable assurance in a particular case that the defendant is guilty, then we must vacate the conviction. Most Rule 11 cases are about whether the defendant was sufficiently advised of some procedural right he was giving up or sufficiently

understood some detail of sentencing. This one is about the even more fundamental question of whether he committed the crime.

How could the district judge know whether Timbana did it? Ordinarily it is enough that the defendant said he did it. But in this case we have a problem. Timbana signed the written plea agreement with an "X" instead of a signature. That suggests to any reasonable person that he is not much of a reader. Nor does Timbana look as though he could do the crime. Timbana is paralyzed on one side of his body, brain damaged, and spends most of his time in a wheelchair. Yet he is supposed to have repeatedly stabbed the victim to death with a knife, flipping the victim over and wrestling with him on the floor, while simultaneously fending off his wife, who was trying to get Timbana off the victim. Timbana was never asked how he accomplished this athletic miracle. In the change of plea proceeding, the judge asked the prosecutor what Timbana did, and the prosecutor answered with a lengthy description, supplying all the elements of the crime and the prosecution's theory of what happened. Then the judge asked Timbana if he agreed with what the prosecutor had said, and Timbana said "yes." The physical implausibility was left unexplained. The judge never asked Timbana what he did or how, in light of his physical limitations, he did it. Though in most cases there would be no reason to doubt the reliability of a "yes" answer to the question of whether the defendant agreed with what the prosecutor said he did, in this one there was so much reason to doubt it that the change of plea should not stand.

What distinguishes this case is that the judge knew, from Timbana's competency examination, that he was brain-damaged and of very low intelligence. The likelihood that Timbana actually understood

what the prosecutor said was not especially high. The judge also knew that Timbana's physical limitations made it unlikely that he could have committed the crime as it had been described by the prosecutor, and that Timbana had told the examining psychologist that he had been "set up" for the murder. Also, by sentencing, the judge had before him two inconsistent accounts, one from the prosecutor and the other from the probation officer, of the circumstances under which Timbana was supposed to have killed the victim. Despite all of this, the judge never asked Timbana to say in his own words what he did or how he did it. Though in most cases that would not be necessary, in this one it was. Where a person's understanding of his plea is questionable and there are substantial reasons to doubt that the person committed the crime, a district judge ought to inquire sufficiently to assure that he did, before convicting him. Without such an inquiry, the plea violates Federal Rule of Criminal Procedure 11. It did here, and we should reverse.

Federal Rule of Criminal Procedure 11(f) says that "the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." The district court can perform this duty of inquiry in various ways. A good way to get a reliable plea is to ask the defendant, under oath pursuant to Rule 11(c)(5), what he did. The Supreme Court has endorsed this technique: "the sentencing judge must develop, *on the record,* the factual basis for the plea, as, for example, *by having the accused describe the conduct that gave rise to the charge.*" [1] This makes it easy to dispose of the frequent subsequent claims by defendants that they did not commit their crimes, but their lawyers made them plead guilty.

Another kind of colloquy is to ask the prosecutor what the defendant did, and

---

1. *Santobello v. New York,* 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (emphasis added).

then ask the defendant whether what the prosecutor says is true. That obviously is less searching, though as the Advisory Committee Note relating to the 1966 amendment indicates, it is often sufficient. This form of inquiry was used in this case. All Timbana had to say and did say was "yes." He never had to state, under oath, what he did.

While the short form colloquy used would suffice in many or most cases, in this one, it was in my judgment an abuse of discretion. The judge had reason to know two things that required a more searching inquiry. One was that Timbana was brain damaged and of very low intelligence, so a simple "yes" could be unreliable on account of Timbana not understanding what he was saying "yes" to. The second was that the circumstances made it implausible that Timbana had committed the crime. These two factors give rise to a real concern about whether an innocent man was pleading guilty to a murder that he did not commit. The district court should have conducted a more searching inquiry to find out.

The judge had previously ordered that a competency examination be performed on Timbana. The court learned from the report that although Timbana was competent to stand trial, he was brain damaged and of very low intelligence. I agree with the majority that the competency finding was adequately supported. My dissent does not go to the competency issue. The information the judge gained from the competency examination, however, should have given rise to a concern by the district court whether a simple "yes" was adequate for this man, in this case, to establish the truth of what he was saying "yes" to. The prosecutor explained what the elements of the crime were and what his theory of the facts was, and then Timbana was asked whether he agreed with what the prosecutor had said.[2] When Timbana said "yes," did he understand what he was saying "yes" to? Did he recollect accurately what he had done? Did he recollect accurately what the prosecutor had just said he did, all 29 lines of it? Did he intend to say that he had done what the prosecutor described? Considering his brain damage and low intelligence, known to the judge, a simple "yes" was a little too simple to give a judge confidence that he did.

One of the psychologists who gave the court the competency report prior to the

2. Here is the part of the colloquy establishing the factual basis for the plea. Ms. Rodriguez is the Assistant United States Attorney.

THE COURT: Ms. Rodriguez, would you set forth the elements of the offense and what the evidence would show.

MS. RODRIGUEZ: Your Honor, the elements of second-degree murder are that the Defendant killed a human being with malice aforethought; meaning either deliberately and intentionally or recklessly with extreme disregard for human life and that those actions occurred on the reservation, with the Defendant being an Indian. Our evidence would show that John Timbana lived on the Fort Hall Indian Reservation in February of this year. On February the 11th of 1996, he, Verdick Eldredge and Alvina Phelps spent the afternoon at his home drinking beer. Timbana and Phelps, excuse me. It was Alvina Phelps. Timbana and Phelps had been common-law married, but she was then, as she described it, with Eldredge and had a baby with him.

Eventually that afternoon Eldredge passed out on the floor lying on his stomach. Alvina Phelps went into the bathroom and when she returned, she saw the Defendant on top of Eldredge, stabbing him in the back. Eldredge rolled over, kicking the Defendant and the Defendant then stabbed Eldredge seven more times in the chest, killing him. Phelps wrestled the knife away from Mr. Timbana, threw it into the other room and called for help. The Defendant was then arrested.

The next morning the Defendant waived his Miranda rights and gave a statement to the Fort Hall Police. He told them that he stabbed Eldredge in the back while Eldredge was asleep on the floor and then stabbed him in the chest with the kitchen knife because he was angry at Eldredge for, quote, "intruding in his marriage life."

Defendant John Timbana is an Indian.

BY THE COURT:

Q Mr. Timbana, do you agree with what Ms. Rodriguez has said about what you did?

A Yes.

change of plea, Mark D. Corgiat, Ph.D., wrote in his report to the court that Timbana was "a very poor historian." He had "a marked indentation in the left skull," "speech problems were notable," and "concentration is impaired." His "auditory attention skills" (those that he would need to listen to what the prosecutor said he did) "were also markedly impaired." He tested in the 3rd percentile on tasks measuring brief auditory attention (three standard deviations below normal), tested in the 3rd percentile on tasks measuring immediate recall of auditorially presented paragraph information, and tested in the "very seriously impaired" range for tasks measuring complex attention skills. His intelligence was in the "borderline retarded range." When Dr. Corgiat examined him, Timbana "incorrectly identified the month, day of month, and day of week," misidentified where he was, and misidentified the president (in 1996 when he was examined) as Ford and the preceding president as Eisenhower. Dr. Corgiat advised the court that although Timbana was competent to stand trial, "other overlying neurocognitive and neurobehavioral difficulties will clearly reduce the quality of his ability to participate."

Linda Berberoglu, Ph.D., at the Federal Medical Center at Rochester Minnesota, advised the court that "although Timbana currently suffers from a mental disease or defect," he was competent to stand trial. Dr. Berberoglu described Timbana as slightly more competent than Dr. Corgiat had, but she too said he had "borderline intellectual functioning and moderate cognitive impairments," and she diagnosed "dementia due to head trauma." She reported that Timbana had said that what he was charged with was "a set-up." She said that "[b]ecause of Mr. Timbana's cognitive deficits, it will be critical for his attorney to devote sufficient time to carefully explain legal options and clarify his level of understanding during the proceedings."

The judge knew all this. These were reports the district court had obtained to make the competency determination.

Nor was this all. Besides being brain damaged and of very low intelligence, Timbana was partially paralyzed and generally stayed in a wheelchair. Dr. Corgiat described significant paralysis of one side of the body:

Gross motor movements are markedly impaired. He has significant left-sided paralysis. There is also evidence of right hemiparesis. Apparently, he is able to walk with a cane but most frequently uses a wheelchair. He seems to have moderately impaired gross motor control on his right side. He had difficulty controlling his hand for finer movements such as putting the blocks together on the WAIS–R testing. He has a brace on his left forearm. Fine motor movements are similarly impaired severely on the left and moderately on the right. He is barely able to write his name. He has very poor control for fine motor skills although he does have only mild impairment of his grip strength on the right.

This physical impairment might not matter much if Timbana were accused of shooting the victim. A disabled individual in a wheelchair can easily commit murder with a gun. But Timbana was accused of stabbing to death an able-bodied man. As the prosecutor described his theory of the crime at the change of plea proceeding, the victim was passed out on the floor on his stomach. Alvina Phelps, who was Timbana's common-law wife but was having a sexual relationship with Eldredge, came out of the bathroom and saw Timbana "on top of Eldridge, stabbing him in the back." Eldredge rolled over and kicked Timbana. Then Timbana stabbed Eldridge seven more times in the chest.

Even with Timbana admitting to all this, the inescapable question for anyone contemplating this partially paralyzed defendant in a wheelchair would be "how did you manage to do that?" No question like

that was asked when Timbana changed his plea. It should have been.

The change of plea proceeding was not the last chance to inquire, nor was this the last information the district court had. Rule 11(f) says that the court "should not enter a judgment" on a guilty plea "without making such inquiry as shall satisfy it that there is a factual basis for the plea." That means that the district court's duty to inquire into the factual basis does not end when the plea is taken. It continues until judgment is entered. It is rarely necessary to inquire further into the factual basis at the time of sentencing, but occasionally the additional details then put before the court give rise to a serious question of whether the defendant committed the crime to which he pleaded guilty. That happened in this case.

The presentence report said that Alvina Phelps, Timbana's common law wife, reported that Timbana was angry because "she was having a relationship" with the victim. The victim had passed out. Phelps came out of the bathroom and saw Timbana stabbing the victim. She struggled with him for the knife, but he overcame her and again stabbed the victim. But Timbana told the police that Phelps and the victim had attacked him, had beaten him, "and were attempting to strike him on the metal plate which is in his head." He confessed to stabbing the victim several times while the victim was unconscious, but explained that "it was self-defense." The presentence report says that Timbana had knife wounds on his hands and a stab wound on his right leg, which he said he got while grabbing the knife as Phelps wielded it. The probation officer noted that Timbana "has difficulty in communicating and expressing himself."

This account in the presentence report differs from the one the prosecutor gave at the change of plea proceeding and raises serious questions about the factual basis for the plea, despite Timbana's confession. How did Timbana get knife wounds on his hands, typically defense wounds, unless someone else was wielding the knife against him? If, as the new account says, the victim was passed out, how could the partially paralyzed Timbana roll him over, as he would have to in order to stab him in the chest? If, as the change of plea account says, the victim and Phelps were both fighting Timbana, how could he defeat them? Phelps said that Timbana had needed help getting back into his wheelchair when he fell out, because he was drunk. All this raises serious additional questions about Timbana's ability to fight off two people and kill one of them. The defendant had no adult criminal convictions and no juvenile adjudications, so there was nothing in his history to suggest a capability and inclination toward violent crime or any other sort of crime.

The physical condition of the defendant, apparent to the judge, made the crime implausible (though perhaps not impossible). Detailed questions such as I have raised are easier to formulate on appeal, with the advantage of the briefs that we have, than in the district court. But the more general question, "how did you do that?" would inescapably occur to anyone, without extended deliberation, based on the defendant's physical condition and the nature of the crime. Following the procedure the Supreme Court suggested in *Santobello*, the district judge could have asked it.

Timbana's pro se brief on appeal says that he told his lawyer he did not commit the murder. Timbana also filed an affidavit with his brief saying that Alvina Phelps killed the victim and then tried to stab him. That would explain the wounds on his hand and leg that the police observed. Timbana says, "I was told that I should take responsibility for this crime as my children were raised and that Alvina had small children [who] needed to be with their mother." That would explain the "set up" remark that Dr. Berberoglu had reported to the court. The affidavit is signed with a fingerprint rather than a signature and appears to be prepared, like

his other pro se papers, by some highly capable individual in prison with him. It was not part of the record before the district court and cannot be considered as a basis for holding that the district judge abused his discretion. I mention it for two reasons. Had the judge placed Timbana under oath and asked him what he did, Timbana might have told this story, leading to further inquiry, or he might have admitted committing the murder and described how he managed to do it despite his infirmities, eliminating doubts about his guilt and his understanding of his plea. The affidavit and pro se brief tell a story of Timbana "taking the fall" for Phelps, his common law wife, by a false plea of guilty. Prevention of a false plea whereby an innocent person "takes the fall" for a guilty one is one of the reasons why Rule 11(f) requires independent inquiry by the judge to assure that there is a factual basis for the plea.

The panel majority says that Timbana's plea agreement and answers during the hearing showed that the plea was voluntary and knowing, and that Timbana's agreement with the prosecutor's recitation of facts was enough to establish a factual basis. I cannot agree.

The first problem is that the recitations of the written plea agreement are not a reliable indicator of what Timbana intended to say because he is illiterate and could not have read and understood it. Timbana signed the plea agreement with an "X," not a signature. Dr. Corgiat described Timbana's reading ability as "markedly impaired." Timbana tested right at "the baseline level for literacy in the United States" for reading comprehension, and his spelling and word recognition skills fell significantly below that level. This hardly instills confidence that Timbana understood what he was signing.

The second problem is that a careful reading of the hearing transcript casts serious doubt as to whether Timbana truly knew what was going on. Almost all of Timbana's answers were a simple "Yes," even to questions asking him if he understood difficult legal concepts such as malice aforethought.[3] If a person says "yes" when the true answer is almost certainly "no," that throws doubt on his other "yes"

---

3. Here are some examples:
   BY THE COURT:
   Q Do you understand that to kill with malice aforethought means to kill deliberately and intentionally or to kill recklessly with disregard for human life; do you understand that?
   A Yes.

   Q And do you understand that I would instruct the jury that if you chose not to testify, that they are not to draw any conclusions from that fact concerning your guilt?
   A Yes.

   Q If, however, your case presents unusual features, the law permits the judge to depart from the guidelines and impose a sentence either above or below the recommended range, but that would be only if your case has unusual or unique features; do you understand that?
   A Yes.

   Q Now, our local rules here in the District of Idaho require that you file your objections in writing to the presentence report prior to the hearing. Mr. Whittier is aware of this and he will make sure that those objections are filed. If Counsel fails to communicate with the probation officer any objections which he may have on your behalf as to any material information, sentencing classifications, Sentencing Guideline ranges and policy statements contained in or omitted from the report, the Court may accept the report as accurate because of your failure to file any objections. So, Mr. Whittier, I guess, is put on notice that he must file those objections and he will visit with you, go over the report with you in detail, determine what objections you may have and then notify Mr. Bradley of those objections; do you understand that?
   A Yes.

answers. When the judge asked Timbana why he was there, he twice answered that he was waiting for the judge's decision, and only on being pressed said that he was "going to decide to take second-degree murder, change it."

On two occasions, Timbana said "Yes" he understood things that it later became clear he did not understand. During the discussion of reasonable doubt, the judge asked Timbana if he understood the Government's burden of proof. Timbana answered "Yes." The judge then asked the *same question* in a slightly different form, and Timbana did not respond. It was only after the judge specifically asked Timbana if he wanted him to explain it that Timbana asked for further explanation, and only after *seven* attempts to explain it, that Timbana said that he "roughly" (and incorrectly) understood the Government's burden to be that of "perfect evidence." [4] During the discussion of sentencing recommendations, the judge asked whether Timbana understood that the judge was not bound by the prosecution's recommendations. Timbana said he understood. When the judge asked the *same question* again, Timbana asked, "What do you mean?" [5] The record also shows that, at

4. Here is the discussion of reasonable doubt:

Q Do you understand that at the trial you would be presumed to be innocent and the Government would be required to prove you guilty by competent evidence and beyond a reasonable doubt before you could be found guilty?

A Yes.

Q Do you understand that you would never have the burden to prove yourself innocent, the burden is always with the Government to prove you guilty beyond a reasonable doubt; do you understand that?

A (No audible response.)

Q All right. Let me try to explain it a little better. Do you understand that a defendant in a criminal case does not have to prove that he or she is innocent; the burden is always on the Government to prove you guilty beyond a reasonable doubt; do you understand that? Do you want me to explain it to you or—

A Yeah.

MR. WHITTIER: Your Honor, I think the language he's having trouble with is the "reasonable doubt" language.

THE COURT: Okay.

BY THE COURT:

Q We put a real high burden on the Government in a criminal case, Mr. Timbana, they don't just have to prove that it probably happened, they have to prove that you committed the crime with a great deal of certainty, beyond a reasonable doubt, so that a jury has to be very convinced that you would commit the crime. That's the burden that the Government would have in a criminal case; do you understand that?

A Not really.

Q Okay. Well, it's for your protection and it's true in every criminal case in the United States, that the Government, the Prosecutor or the U.S. Attorney, has to prove you guilty to a high degree of evidence, with real certainty, that we are absolutely sure or quite sure—very sure, I should say, that you committed the crime before you could be convicted; do you understand that?

A Well, roughly, yeah.

Q Okay. I don't know how to explain it any different than the way I have. Is there a specific question you have about that right?

A No.

Q Okay.

MR. WHITTIER: Your Honor, if I might. Again, how I explained it to Mr. Timbana was that the U.S. Government, in proving their case, would have to convince all 12 of the jurors, every one of them, unanimously the fact that he committed the crime. That is how it was explained to him by me.

THE COURT: That's another very good point.

BY THE COURT:

Q Do you understand that, Mr. Timbana? That all 12 jurors would have to agree that the Government has proved you guilty?

A Not really. They have to have perfect evidence though for me doing that.

Q Okay. Now, you're understanding the notion. I don't know if "perfect evidence" is the right word. But you understand that they have to have very strong evidence before you could be convicted; is that your understanding?

A (Witness nodding head.)

Mr. WHITTIER: You have to answer out loud.

THE WITNESS: Yeah.

5. Here is the discussion of sentencing recommendations:

one point and presumably throughout the hearing, the judge knew that his explanations might be inadequate and were being supplemented by *off-the-record* communications between Timbana and his attorney.[6] The reports of Timbana's mental limitations and the judge's experience with Timbana during the hearing gave him more than enough reason to believe that a simple "Yes" from him was unreliable.

The third problem is, even if Timbana understood what was being said in the hearing and what he was pleading guilty to, the judge still had an independent duty under Rule 11(f) to satisfy himself of the factual basis for the plea. For example, if a paraplegic tried to plead guilty to killing five professional wrestlers with his bare hands, the judge could not accept the plea simply because the paraplegic said that it happened. He would be obligated to inquire into how the paraplegic had managed so unlikely a feat. That Timbana may have understood his rights does not satisfy the judge's duty under Rule 11(f). The judge has an independent duty, even where the defendant fully understands his rights and wishes to plead guilty, to satisfy himself that there is "a factual basis" for the plea.

The First, Second, Third, Fourth, Fifth, Eleventh and District of Columbia Circuits have spoken on analogous facts and held that where the particular circumstances made the defendant's plea suspect, an otherwise adequate Rule 11 colloquy had to be broadened, requiring reversal. Our case here is even more compelling than those, and so the majority opinion puts us at odds with those seven circuits. No other circuit has taken the majority's view.

The District of Columbia Circuit in *United States v. Masthers*[7] held that the standard Rule 11 colloquy given by the District Court was inadequate for a defendant with significant mental limitations, vacated the plea, and ordered a hearing on the defendant's competency. The court explained that the district court could not rely on the defendant's simple "Yes, Ma'am," and "No, Ma'am" answers to its questions to sustain the plea.[8] "[A]lthough the district court addressed appellant before accepting his plea, it is apparent that the standard Rule 11 colloquy may prove an inadequate measure of the validity of a plea proffered by a defendant of questionable mental competence."[9]

In *Monroe v. United States*,[10] the Fifth Circuit also held that a defendant's mental limitations made a Rule 11 colloquy inadequate even though it would ordinarily have been sufficient. As in the case at bar, the defendant was of quite low intelligence,

---

BY THE COURT:
Q   Mr. Timbana, do you understand that I would not be bound by any recommendation made by the Government in the plea agreement? They may recommend what sentence.
THE COURT: I believe they may have recommended acceptance of responsibility; is that correct?
MS. RODRIGUEZ: Yes, Your Honor.
BY THE COURT:
Q   Do you understand that, Mr. Timbana?
A   Yeah.
Q   And I'm not bound by that; do you understand that?
A   What do you mean?

6.   Here is the reference to the off-the-record communications. Mr. Whittier is Timbana's attorney.

BY THE COURT:

Q   In addition, there is what we call a second sentence if I impose a sentence of incarceration, after you have completed that sentence, you'll be put on supervised release for a term of up to five years; do you understand that?
A   Yes.
Q   *I guess I overheard Mr. Whittier's comment.* It is very much like probation in State Court or parole in State Court; do you understand that?
A   Yes.

7.   *United States v. Masthers*, 539 F.2d 721 (D.C.Cir.1976).

8.   *Id.* at 723, 728.

9.   *Id.* at 728.

10.   *Monroe v. United States*, 463 F.2d 1032 (5th Cir.1972).

and as in the case at bar, the form of the colloquy was that the judge had the Assistant United States Attorney recite the factual basis for the plea, and then obtained the defendant's confirmation that the prosecutor's recitation was correct.

The Eleventh Circuit in *Gaddy v. Linahan*[11] held that the plea of a defendant with notable mental limitations violated due process where the only explanation of the crime charged at the plea colloquy consisted of the prosecutor reading the indictment to the defendant. "Though a rote reading of the indictment or charging document may be sufficient to put a defendant on notice of the elements of the charge in some circumstances, it is inadequate when the defendant has minimal intelligence, the charge is complex, and the sentence to be imposed is substantial."[12] The court explained that the defendant's affirmative responses that he understood did not show that he actually grasped the difficult legal concepts involved. "[C]onclusory responses by a defendant and his counsel to a court's inquiry into whether the defendant 'understands' the charge is not sufficient to establish that the defendant actually has knowledge and understanding, particularly when he possesses minimal intelligence."[13] The court concluded that

[t]he terms "murder" and "malice aforethought," as they appear in the indictment, are not readily understandable by a layman, particularly one of minimal intelligence. They are complex legal terms, the discussion of which consumes pages of Georgia case law. Considering the petitioner's lack of intelligence, his expressed confusion, the complexity of

the case, and the extraordinary consequences of pleading guilty to malice murder, a more thorough explanation of the nature of the crime and its elements was required to satisfy the tenets of due process.[14]

Other circuits have held that a district court must make further inquiries about a defendant's understanding in the analogous situation of when it has reason to suspect that a defendant's thought processes are impaired by the influence of drugs or alcohol. In *United States v. Parra–Ibanez*,[15] the First Circuit held that where "the district court had reason to suspect" that tranquilizing medications prescribed for defendant by the physicians who examined him for his competency determination "might impinge" on his capacity, a standard Rule 11 colloquy "did not probe deeply enough." When the district court has information before it suggesting impairment, it "must broaden its inquiry." This obligation of further inquiry "was not ameliorated" by the competency determination.[16]

The Second Circuit reached the same conclusion in *United States v. Rossillo*.[17] There, the court held that the district court should have "inquired further into defendant's state of mind once the court was alerted that defendant might be under the influence of medication."[18] "We believe that if there is *any* indication, as there was in this case, that defendant is under the influence of any medication, drug or intoxicant, it is incumbent upon the district court to explore on the record defendant's ability to understand the nature and consequences of his decision to plead guilty."[19]

11. *Gaddy v. Linahan,* 780 F.2d 935 (11th Cir. 1986).

12. *Id.* at 945.

13. *Id.*

14. *Id.* at 946.

15. *United States v. Parra–Ibanez,* 936 F.2d 588, 595–96 (1st Cir.1991).

16. *Id.* at 596, n. 16.

17. *United States v. Rossillo,* 853 F.2d 1062 (2d Cir.1988).

18. *Id.* at 1067.

19. *Id.* at 1066.

The Third Circuit likewise held that a district court must "make further inquiry," despite a "lengthy" Rule 11 colloquy, where a defendant's answer to one of the routine questions is that he had recently ingested drugs that would affect his thinking, and the district court did not broaden the inquiry in response to the answer.[20]

The Fourth Circuit has joined these other circuits and held that the district court erred by continuing with a routine Rule 11 colloquy after a defendant's answers about current drug use had raised a "red flag" as to his "competence to plead guilty."[21] "[W]hen an answer raises questions about the defendant's state of mind, the court must broaden its inquiry to satisfy itself that the plea is being made knowingly and voluntarily."[22]

In all of these cases, the district courts had conducted Rule 11 colloquies that would in most cases be adequate. But these colloquies were inadequate, requiring the judgments to be reversed and the pleas to be vacated, where circumstances known to the judge gave reason to suspect that the defendants might not be acting with adequate capacity.

The majority attempts to distinguish the cases I have cited, and they are all distinguishable on one ground or another (as cases usually are), but the distinctions do not make a difference. It does not matter that in some of the other circuit's cases, a record had been developed in habeas corpus proceedings while our case comes up on direct review, because a sufficient record was developed in our case in the competency proceedings. Nor does it matter that in some of the other circuit's cases, there had been no competency examination at the time of the plea, while in ours Timbana had been adjudicated competent, because the record presented to the court in the competency adjudication itself established doubts both as to whether Timbana had committed the crime charged and whether he could understand the routine change of plea script.

The majority reads our sister circuits' cases to establish merely that "where a district court is made aware during a Rule 11 proceeding that a defendant's competency to enter a plea may be impaired, it must conduct an inquiry before accepting a guilty plea." I assume that what the majority means by "an inquiry" is an inquiry into competency. I read our sister circuits' cases to establish that a Rule 11 colloquy that would suffice in most cases is not adequate where the circumstances cast doubt on the defendant's ability in the particular circumstances to understand what he is doing and make a voluntary choice to plead guilty. The cases I have cited go to whether the plea was voluntary and intelligent, without reaching the question whether there was a factual basis for the plea, but that makes them stronger rather than weaker authority for my view. If a man is not only of such low intelligence to cast doubt on the reliability of his simple "yes" answer to a complex question, but also appears to be physically unable to have done what he appears to be admitting, that establishes more reason, not less, to inquire further.

That a defendant has been adjudicated competent to stand trial does not eliminate the need for a more extensive inquiry than usual in a change of plea proceeding. One of our sister circuits has spoken to precisely this issue, in the case of a person adjudicated competent to stand trial, but disabled mentally by drugs at the time of the change of plea proceeding, and held that the prior competency adjudication *heightened* the district court's obligation to conduct further inquiry because it made the judge aware of the defendant's past histo-

---

20. *United States v. Cole,* 813 F.2d 43 (3d Cir. 1987).

21. *United States v. Damon,* 191 F.3d 561, 565 (4th Cir.1999).

22. *Id.*

ry of drug use.[23] Just as a person may be competent to stand trial but need a non-routine colloquy because he speaks only a foreign language and needs an interpreter,[24] he may be competent to stand trial but need a more searching inquiry to assure that there is a substantial basis in fact for a voluntary and intelligent plea. All a competency adjudication establishes is that the defendant is able "to understand the nature and consequences of the proceedings against him [and] to assist properly in his defense."[25] A guilty plea requires "such inquiry as shall satisfy [the court] that there is a factual basis for the plea."[26] They differ. Competency to enter a plea does not establish that a routine inquiry suffices where the very reports establishing competency also establish a need for more thorough inquiry.

The colloquy here did not establish a substantial basis in fact for the plea. Timbana was only barely competent, and knowing that and the physical implausibility of his guilt, the district court had a responsibility to conduct a more thorough Rule 11 colloquy to ensure an adequate factual basis in the record. This case is an even stronger one for vacating the plea than those in the seven other circuits, because the adequacy of the plea is undermined by the physical implausibility of the crime in addition to the defendant's limited ability to understand the change of plea agreement.

We should hold, consistently with the law established in the First, Second, Third, Fourth, Fifth, Eleventh, and D.C. Circuits, that where the factual circumstances or the defendant's condition make the guilty plea suspect, the district court must broaden what would otherwise be a satisfactory Rule 11 colloquy to address those circumstances. By the time Timbana was to be sentenced, the district court had considera-

ble reason to suspect both that the plea was false and that Timbana did not fully comprehend the change of plea proceedings. All the judge had to do in order to obviate these doubts was to ask Timbana to state what he did in his own words. Of course, there was the risk that the plea bargain would fall apart, because his story would make it inappropriate to accept his plea. He might have said that he did not do it but agreed to accept the blame, or that he did but it was self-defense. But if that occurred, it would be appropriate to try the case in order to find out whether he stabbed Eldredge to death. What usually occurs when a defendant is asked under oath what he did is that he furnishes an iron-clad factual basis for the plea and an aid for sentencing.

The Rule 11 colloquy is not a mere exercise in script reading. It has a purpose. Innocent people may plead guilty, for various reasons. An innocent person may want to take advantage of a discounted sentence in a plea bargain, rather than gamble on a far greater sentence if a mistaken verdict is returned. Or a person may not know what he is admitting and accept his attorney's advice that a guilty plea is prudent. Or a person may be under some pressure to accept responsibility for something he did not do, in order to protect someone else, whom he loves or fears. When a district judge has reason to suspect that a defendant is not guilty of what he is admitting at his colloquy or does not understand what he is admitting, the judge has a duty to broaden the inquiry. In this case, Timbana's brain damage and physical infirmity gave reason to suspect that he had not committed the murder and did not understand the colloquy. When a brain damaged, illiterate man says "yes" to the question whether he understands what "malice aforethought" means,

---

**23.** *Parra–Ibanez,* 936 F.2d at 596 n. 16.

**24.** *Cf. Masthers,* 539 F.2d at 730 (Hastie, J., concurring).

**25.** 42 U.S.C. § 4241(a); *see Godinez v. Moran,* 509 U.S. 389, 402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *Spikes v. United States,* 633 F.2d 144, 146 (9th Cir.1980).

**26.** Fed. R.Crim. Proc. 11(f).

a sensible person would have to be skeptical of all his other simple "yes" responses. And if he further admitted to having accomplished a physical feat of which he looked incapable, even more skepticism would ineluctably motivate most people to ask "how?"